*951
 
 OPINION
 

 Per Curiam:
 

 This original writ petition challenges the district court’s jurisdiction over a class action complaint against petitioner Nevada Power Company that alleges causes of action for deceptive and unfair trade practices, breach of the covenant of good faith and fair dealing, and breach of contract. We address two principal issues. First, does the district court have subject-matter jurisdiction to entertain a complaint against a public utility that alleges causes of action for unfair and deceptive trade practices, breach of the covenant of good faith and fair dealing, and breach of contract? Second, if the district court does have jurisdiction over those claims, does the Public Utilities Commission of Nevada (PUC) have primary jurisdiction over them so that the district court should defer to the PUC? We conclude that the district court has subject-matter jurisdiction over the claims against Nevada Power and properly chose to exercise that jurisdiction. Accordingly, we deny the petition.
 

 
 *952
 
 FACTS
 
 [2]
 

 Petitioner Nevada Power is a regulated public utility that provides electric power to more than 657,000 residential and commercial customers in southern Nevada. The real parties in interest are Bonneville Square Associates, LLC, and Union Plaza Operating Company.
 
 [3]
 
 Bonneville is primarily engaged in the business of owning commercial office buildings and has its principal place of business in Las Vegas, Nevada. Union Plaza is engaged in the business of hotel and gaming operations and also has its principal place of business in Las Vegas. Bonneville and Union Plaza are commercial customers of Nevada Power.
 

 Nevada Power classifies its customers by size and the voltage level at which service is taken and charges its customers based on rates approved by the PUC. Nevada Power classified Bonneville and Union Plaza as Large General Service-Secondary (LGS-S) customers and charged them at the LGS-S rate.
 

 The LGS-S customers receive service at an incoming voltage of approximately 12,000 volts. That voltage must be reduced or converted to 480 volts before the customer can use the power. As part of its service to LGS-S customers, Nevada Power provides an on-site transformer to perform this conversion. The transformer uses energy in the conversion process. As the owner of the transformer, Nevada Power is responsible for its maintenance and upkeep, including the energy used in the conversion process. The LGS-S rate includes costs related to the maintenance and upkeep of the transformers and the energy lost in the conversion process.
 

 Another class of Nevada Power customers of similar size and receiving a similar incoming voltage level own their own transformers. These customers are charged at the Large General Service Primary (LGS-P) rate. Because an LGS-P customer owns the transformer and provides for its maintenance and upkeep, including the energy lost in the conversion process, the LGS-P rate does not include those costs and is therefore lower than the LGS-S rate.
 

 The customer is charged for electricity based on a meter reading. Meters can be placed on either side of a transformer: on the primary side of the transformer, before the conversion process, or on the secondary side of the transformer, after the conversion process. Because energy is lost in the conversion process, the meter’s placement affects the amount of electricity that the cus
 
 *953
 
 tomer is charged for using. The LGS-S customer, since it does not own the transformer, does not use the energy lost in the conversion process. Thus, the meter usually is placed on the secondary side of the transformer, after the conversion has taken place, so that the LGS-S customer is not charged for energy that it did not use. In contrast, the LGS-P customer is usually metered on the primary side of the transformer to account for the energy used by its transformer.
 

 When Union Plaza built its two towers in 1971 and 1983, Nevada Power prepared the plans for the placement of the meters and transformers needed for the towers. Although Nevada Power had classified Union Plaza as an LGS-S customer, Nevada Power’s plans called for the meters to be placed on the primary side of the transformers for both towers. When Nevada Power presented the plans to Union Plaza, it represented that primary side placement of the meters was in Union Plaza’s best interest because Nevada Power would pay for the meters and installation costs if the meters were placed on the primary side of the transformers. Nevada Power did not disclose that because Union Plaza was an LGS-S customer, metering on the primary side would result in it being charged twice for the lost energy.
 

 In 1990, Bonneville expanded its office building in Las Vegas. As part of the expansion, Bonneville planned to install a new meter and transformer. Nevada Power prepared the plans for the placement of the meter and transformer. Although Nevada Power was charging Bonneville at the LGS-S rate, Nevada Power prepared plans that placed the meter on the primary side of the transformer and represented to Bonneville that this meter placement was in Bonneville’s best interest because Nevada Power would pay for the meter and installation costs if it were placed on the primary side. As in its interactions with Union Plaza, Nevada Power did not disclose that because Bonneville was an LGS-S customer, metering on the primary side would result in it being charged twice for the lost energy.
 

 Bonneville and Union Plaza, individually and on behalf of others similarly situated, filed in the district court a class action complaint against Nevada Power. In the first amended class action complaint, Bonneville and Union Plaza asserted claims for unfair and deceptive trade practices, breach of the covenant of good faith and fair dealing, and breach of contract. All three claims are based on the general allegation that Nevada Power deliberately and knowingly engaged in a pattern and practice of misleading or failing to disclose material facts that caused some of its LGS-S customers to be metered on the primary side while being charged the higher LGS-S tariff rate. Bonneville and Union Plaza seek special and compensatory damages and, for the unfair-and-deceptive-trade-practices claim, punitive damages.
 

 
 *954
 
 Nevada Power filed a motion to dismiss for lack of subject-matter jurisdiction and lack of primary jurisdiction. It argued that Bonneville and Union Plaza’s claims essentially challenged the tariff rate and the placement of their meters. According to Nevada Power, those claims are within the PUC’s exclusive jurisdiction and therefore the district court lacks subject-matter jurisdiction. Alternatively, Nevada Power argued that, at the very least, the PUC has primary jurisdiction over the claims and therefore the district court should defer to the PUC and dismiss the complaint. Bonneville and Union Plaza opposed the motion, taking issue with Nevada Power’s characterization of their claims and arguing that the district court, not the PUC, has jurisdiction over those claims.
 

 After hearing arguments, the district court summarily denied the motion. Nevada Power then filed this original petition, and the district court stayed further proceedings in the underlying case.
 

 DISCUSSION
 

 Writ relief
 

 Writ relief is an extraordinary remedy that will only issue at the discretion of this court.
 
 [4]
 
 A writ of prohibition is available to “arrest[ ] the proceedings of any tribunal . . . when such proceedings are without or in excess of the jurisdiction of such tribunal.”
 
 [5]
 

 Nevada Power argues that the district court lacks subject-matter jurisdiction to entertain the complaint filed by Bonneville and Union Plaza because the PUC has either original or primary jurisdiction over the allegations in the complaint. A petition for a writ of prohibition is an appropriate means of challenging the district court’s exercise of jurisdiction.
 
 [6]
 
 Accordingly, we will entertain the petition for a writ of prohibition. But, because we conclude that the district court did not exceed its jurisdiction, we deny writ relief.
 

 Jurisdiction
 

 The overarching issue in this case is the jurisdiction of the PUC and the district court over the causes of action alleged by Bonne
 
 *955
 
 ville and Union Plaza. In their amended complaint, Bonneville and Union Plaza alleged three causes of action against Nevada Power: unfair and deceptive trade practices,
 
 [7]
 
 breach of the covenant of good faith and fair dealing, and breach of contract. Bonneville and Union Plaza alleged that Nevada Power represented to them that “placement of the meter on the primary side of the transformer” was in their best interest because Nevada Power would pay for the meter, installation costs and equipment if the meter was placed on the primary side, whereas Bonneville and Union Plaza would have to bear those costs if the meter was placed on the secondary side of the transformer. Bonneville and Union Plaza further alleged that Nevada Power “never disclosed material facts” that their status as LGS-S customers “entitled them to metering on the secondary or low side of the transformer” and that Nevada Power “failed to disclose that metering on the primary side for LGS-S customers would result in excessive billing.” These general allegations appear to form the basis for all three causes of action stated in the amended complaint. Additionally, the cause of action for deceptive trade practices alleges that ‘ ‘the rate being charged to LGS-S customers is in violation of state statute, namely NRS 704.040, because the service furnished under the LGS-S rate schedule is not just and reasonable” as “some LGS-S customers are metered properly on the secondary or low side of the transformer (post-transformer) while other LGS-S customers are metered improperly on the primary or high side of the transformer (pre-transformer).” The amended complaint seeks special damages equal to the energy lost each month in the conversion process and, for the deceptive-trade-practices claim, punitive damages.
 

 As we recognized in
 
 Consumers League v. Southwest Gas,
 
 the Nevada Legislature has created a comprehensive statutory scheme for the regulation of public utilities.
 
 [8]
 
 As part of that scheme, the Legislature created the PUC.
 
 [9]
 
 Because the PUC is a creature of
 
 *956
 
 statute, it has no inherent power; rather, its powers and jurisdiction are determined by statute.
 
 [10]
 
 The PUC thus has only those powers and jurisdiction as are expressly or “by necessary or fair implication” conferred by statute.
 
 [11]
 
 “Any enlargement of express powers by implication must be fairly drawn and fairly evident from agency objectives and powers expressly given by the legislature.”
 
 [12]
 
 “Any doubt about the existence of [the PUC’s] power or authority must be resolved against finding of such power or authority.”
 
 [13]
 
 But “where power is clearly conferred or fairly implied, and is consistent with the purposes for which the [PUC] was established by law, the existence of the power should be resolved in favor of the commissioners so as to enable them to perform their proper functions of government.”
 
 [14]
 

 The Legislature has expressly given the PUC authority to “supervise and regulate the operation and maintenance of public utilities” in accordance with the provisions of NRS Chapter 704.
 
 [15]
 
 NRS Chapter 704 sets forth the general statutory framework for the regulation of public utilities and the setting of rates that public utilities may charge their customers. In enacting NRS Chapter 704, the Legislature declared the following “purpose and policy”:
 

 1. To confer upon the Commission the power, and to make it the duty of the Commission, to regulate public utilities to the extent of its jurisdiction;
 

 2. To provide for fair and impartial regulation of public utilities;
 

 
 *957
 
 3. To provide for the safe, economic, efficient, prudent and reliable operation and service of public utilities; and
 

 4. To balance the interests of customers and shareholders of public utilities by providing public utilities with the opportunity to earn a fair return on their investments while providing customers with just and reasonable rates.
 
 [16]
 

 The PUC has authority to regulate utility rates under NRS 704.100 to 704.130 and NRS 704.210. We have described that power as being “plenary,”
 
 [17]
 
 meaning that it is “broadly construed.”
 
 [18]
 
 The only limit on the PUC’s authority to regulate utility rates is the legislative directive that rates charged for services provided by a public utility must be “just and reasonable”
 
 [19]
 
 and that it is unlawful for a public utility to charge an unjust or unreasonable rate.
 
 [20]
 
 The PUC also has authority to regulate the service standards and practices of public utilities in accordance with various provisions in NRS Chapter 704.
 
 [21]
 
 Under NRS 704.130, the rates fixed and regulations prescribed by the PUC are lawful and reasonable until modified by the PUC or by a court on judicial review.
 
 [22]
 

 The statutory scheme also authorizes the PUC to entertain customer complaints against a public utility related to the reasonableness of a rate, regulation, measurement, practice or act. Specifically, NRS 703.310(1) provides that the PUC’s Division of Consumer Complaint Resolution must investigate a complaint against a public utility that an unjust or unreasonable rate is being charged for regulated services or that a “regulation, measurement, practice or act affecting or relating to the production, transmission or delivery or furnishing” of power “or any service in
 
 *958
 
 connection therewith or the transmission thereof” is unreasonable, insufficient or unjustly discriminatory. If the Division is “unable to resolve the complaint,” it must transmit the complaint, the results of its investigation, and its recommendation to the PUC.
 
 [23]
 
 The PUC then determines whether there is probable cause for the complaint and, if so, conducts a hearing on the complaint.
 
 [24]
 
 Under NRS 704.120, the PUC has authority to give prospective relief from an unjust, unreasonable, or unjustly discriminatory rate, regulation, practice or service by substituting a just and reasonable rate, regulation, practice or service after an investigation and a hearing.
 
 [25]
 

 The PUC’s decision on a complaint against a public utility is subject to judicial review under NRS 703.373.
 
 [26]
 
 Judicial review under the statute is limited to the record,
 
 [27]
 
 and the court may set aside the PUC’s decision only under certain circumstances.
 
 [28]
 
 Any
 
 *959
 
 party may then appeal the district court’s judgment to this court under NRS 703.376.
 

 The statutory scheme supports the conclusion that the PUC has original jurisdiction over the regulation of utility rates and service. As we explained in
 
 Garson
 
 v.
 
 Steamboat Canal Co.,
 
 “[t]he power to prescribe rates for ... a public utility company is a legislative function as distinguished from judicial power.”
 
 [29]
 
 The Legislature has delegated that power to the PUC.
 
 [30]
 
 Moreover, the Legislature has provided a vehicle for the PUC to entertain complaints against a public utility as to the reasonableness of a rate, regulation, or service, subject to limited judicial review.
 
 [31]
 
 Because that power rests first with the PUC, the courts lack subject-matter jurisdiction except on review as provided in NRS 703.373 to NRS 703.376.
 
 [32]
 
 In other words, a challenge to the reasonableness of a rate or regulation fixed by the PUC must be presented first to the PUC before it may be presented to the courts for judicial review. This is essentially the doctrine of exhaustion of administrative remedies: “ ‘The exhaustion doctrine is concerned with the timing of judicial review of administrative action.’ The doctrine applies only when an administrative agency has original jurisdiction.”
 
 [33]
 

 [Headnote 17]
 

 While the PUC has original jurisdiction over utility rates and service, NRS 41.600 permits a victim of consumer fraud, including a “deceptive trade practice as defined in NRS 598.0915 to 598.0925,”
 
 [34]
 
 to bring an action in court. And the Nevada Constitution states that the district courts have “original jurisdiction in all cases excluded by law from the original jurisdiction of justices’ courts.”
 
 [35]
 
 Additionally, courts in other jurisdictions have
 
 *960
 
 taken the position that the courts have jurisdiction over contract and common-law tort claims against a public utility.
 
 [36]
 
 The question, then, is whether the claims alleged in the amended complaint are within the PUC’s exclusive original jurisdiction or are within the district court’s original jurisdiction. To answer that question, we must look at the substance of the claims, not just the labels used in the amended complaint.
 
 [37]
 

 Nevada Power and the PUC, as amicus curiae, argue that the amended complaint challenges the reasonableness of the LGS-S rate and a tariff that permits Nevada Power to place meters on the primary side of the transformer.
 
 [38]
 
 Consequently, they assert that the PUC has exclusive original jurisdiction and that Bonneville and Union Plaza must challenge the rate and tariff through the administrative proceedings provided by NRS 703.310-.370. We disagree with their characterization of the claims in the amended complaint.
 

 While the amended complaint includes allegations regarding the meter’s proper placement and the reasonableness of the LGS-S rate when the meter is placed on the primary side of the transformer, Bonneville and Union Plaza are not asking the district court to determine the reasonableness of the meter tariff or the LGS-S rate. The meter tariff is permissive; it allows a public utility to meter on the primary side, but it does not set forth the circumstances in which the utility may do so or require that the utility do so in any particular circumstance. Similarly, the LGS-S rate in effect at the times alleged in the complaint did not account for primary-side metering. The meter tariff and the LGS-S rate are relevant to the causes of action alleged in the amended complaint, but those issues are not predominant. Rather, the causes of action focus on Nevada Power’s misrepresentations and failures to disclose information to certain of its customers, resulting in over billing. These claims fall within the district court’s original jurisdiction over claims sounding in tort, contract, and consumer fraud.
 
 [39]
 

 
 *961
 
 Moreover, it appears that the PUC does not have authority to award the compensatory, special, and punitive damages that Bonneville and Union Plaza seek. Although Nevada Power suggests that the PUC can provide similar relief through refunds
 
 [40]
 
 and civil penalties,
 
 [41]
 
 these options, even if they are available, are not equivalent to the relief sought by Bonneville and Union Plaza in the amended complaint. The PUC’s lack of power to grant the relief Bonneville and Union Plaza seek in their suit further supports our conclusion that the PUC lacks exclusive original jurisdiction over the amended complaint.
 
 [42]
 

 The causes of action alleged and the relief sought in the amended complaint are not clearly within the PUC’s exclusive jurisdiction. And, as previously noted, we must resolve any doubt about the existence of the PUC’s authority against finding such authority. Accordingly, we conclude that the PUC does not have exclusive original jurisdiction over the causes of action alleged in the amended complaint and that the district court has original jurisdiction to entertain the amended complaint.
 
 [43]
 

 Nevada Power alternatively argues that even if the district court has original jurisdiction, the PUC has primary jurisdiction because the amended complaint raises issues related to rates and service that are within the specialized knowledge of the PUC and its staff. Based on the doctrine of primary jurisdiction, Nevada Power argues that the district court should have deferred jurisdiction to the PUC and dismissed the amended complaint.
 

 
 *962
 
 Primary jurisdiction “is a concept of judicial deference and discretion.’
 
 [44]
 
 The United States Supreme Court has explained that primary jurisdiction “applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body.”
 
 [45]
 
 As we explained in
 
 Sports Form v. Leroy’s Horse & Sports,
 
 the “doctrine of primary jurisdiction requires that courts should sometimes refrain from exercising jurisdiction so that technical issues can first be determined by an administrative agency.”
 
 [46]
 
 The doctrine is premised on two policies: “ ‘(1) the desire for uniformity of regulation and, (2) the need for an initial consideration by a tribunal with specialized knowledge.’ ”
 
 [47]
 
 Thus, “[i]n every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation.”
 
 [48]
 
 Application of the doctrine is discretionary with the court.
 
 [49]
 

 Based on our review of the amended complaint, we conclude that the district court could have deferred action under the primary jurisdiction doctrine for the PUC to address one issue implicated in the amended complaint: the percentage of electricity used by the transformers in the conversion process. This technical issue lies within the specialized knowledge of the PUC and its trained staff. Additionally, it appears that this issue requires uniformity of regulation. However, during the proceedings in district court, Nevada Power presented a tariff filing to the PUC explicitly asking that the PUC approve a tariff that sets the percentage loss factor. Bonneville and Union Plaza intervened in the PUC proceedings. After the original writ petition was filed in this court, the PUC determined the appropriate transformer loss factor and directed Nevada Power to file a revised tariff. Thus, the PUC has now spoken on this issue and applied its expertise to determine the percentage of electricity used by the transformers in the conversion process. Under NRS 704.130, the PUC’s determination is prima facie reasonable unless it is found otherwise on judicial review.
 
 *963
 
 Because the PUC has now addressed the transformer-loss-factor issue, we conclude that that issue does not warrant application of the primary jurisdiction doctrine. We further conclude that to the extent any other issues in this case are within the PUC’s concurrent jurisdiction, the district court properly exercised its discretion in refusing to defer primary jurisdiction to the PUC.
 

 CONCLUSION
 

 The causes of action alleged in Bonneville and Union Plaza’s amended complaint are within the original jurisdiction of the district court. Furthermore, the district court properly exercised its discretion in refusing to defer primary jurisdiction to the PUC. Accordingly, the district court has not exceeded its jurisdiction. We therefore deny the petition.
 

 [2]
 

 Our recitation of the facts is taken from the real parties’ allegations in their first amended complaint.
 

 [3]
 

 Bonneville and Union Plaza filed suit as representatives for a class of similarly situated Nevada Power customers. It appears that the district court has not yet certified the class. Accordingly, and for the sake of efficiency, we refer solely to Bonneville and Union Plaza as the real parties in interest in this original proceeding.
 

 [4]
 

 Ashokan
 
 v.
 
 State, Dep’t of Ins.,
 
 109 Nev. 662, 665 , 856 P.2d 244, 246 (1993).
 

 [5]
 

 NRS 34.320.
 

 [6]
 

 South Fork Band, Te-Moak Tribe v. Dist. Ct.,
 
 116 Nev. 805, 811, 7 P.3d 455, 459 (2000) (“We have held that a writ of prohibition is an appropriate vehicle through which to challenge the district court’s improper exercise of jurisdiction.”);
 
 see also Snooks v. District Court,
 
 112 Nev. 798, 919 P.2d 1064 (1996) (granting petition for writ of prohibition where district court lacked jurisdiction over complaint filed by non-Indian against Indian for incident that occurred on Indian land or in Indian country).
 

 [7]
 

 In their deceptive-trade-practices claim, Bonneville and Union Plaza specifically allege that Nevada Power’s conduct violates NRS 598.0915(5), (7) and (15), and NRS 598.0923(2) and (3). NRS Chapter 598 generally provides for a public cause of action for deceptive trade practices. NRS 41.600, however, provides for a private cause of action by a person who is a victim of consumer fraud and defines “consumer fraud” to include “[a] deceptive trade practice as defined in NRS 598.0915 to 598.0925, inclusive.” NRS 41.600(2)(d). We are not presented with and express no opinion regarding the merits of the deceptive-trade-practices claim, or the other claims, alleged in the amended complaint.
 

 [8]
 

 94 Nev. 153, 157, 576 P.2d 737, 739 (1978).
 

 [9]
 

 The Legislature created the PUC in 1997. 1997 Nev. Stat., ch. 482, § 65, at 1904 (amending NRS 704.010);
 
 id.
 
 § 332, at 2020 (amending NRS 703.010). Before that, the same authority over the regulation of public utilities resided with the Public Service Commission of Nevada. 1911 Nev. Stat., ch. 162, § 1, at 322.
 

 [10]
 

 50-919 Op. Att’y Gen. 468, 470 (1950) (stating that “[a]ll powers and jurisdiction” of the PUC’s predecessor “must be found within the four corners of the statutes creating it, since it is a tribunal of purely statutory creation”); 57-326 Op. Att’y Gen. 275, 275-76 (1957) (stating that PUC’s predecessor was a creature of statute and thus derived its powers from statutory provisions); 73B C.J.S.
 
 Public Utilities
 
 § 159, at 408 (2004) (“A public service or public utilities commission derives its authority, powers, duties, and jurisdiction from . . . statutory provisions.”).
 

 [11]
 

 57-326 Op. Att’y Gen. 275, 276 (1957);
 
 see also Chugach
 
 v.
 
 Regulatory Com’n of Alaska,
 
 49 P.3d 246, 251 (Alaska 2002) (stating that regulatory commission is administrative agency that has whatever powers are expressly granted by legislature or conferred upon it by implication as necessarily incident to exercise of express powers);
 
 Union Pacific v. State ex rel. Corp. Com’n,
 
 990 P.2d 328, 329 (Okla. Civ. App. 1999) (stating that corporation commission has only such authority as is expressly or by necessary implication conferred by statute);
 
 US West v. Public Service Com’n,
 
 998 P.2d 247, 249 (Utah 2000) (stating that public service commission has no inherent regulatory powers other than those expressly granted or clearly implied by statute); 73B C.J.S.
 
 Public Utilities
 
 § 159, at 408.
 

 [12]
 

 73B C.J.S.
 
 Public Utilities
 
 § 159, at 409.
 

 [13]
 

 Id.
 
 § 166, at 413.
 

 [14]
 

 Id.
 
 at 413-14.
 

 [15]
 

 NRS 703.150.
 

 [16]
 

 NRS 704.001.
 

 [17]
 

 Consumers League,
 
 94 Nev. at 157, 576 P.2d at 739.
 

 [18]
 

 Black’s Law Dictionary
 
 1189 (7th ed. 1999).
 

 [19]
 

 NRS 704.040(1).
 

 [20]
 

 NRS 704.040(2).
 

 [21]
 

 See generally
 
 NRS 704.143-.320.
 

 [22]
 

 NRS 704.130 provides:
 

 1. All rates, charges, classifications and joint rates fixed hy the Commission are in force, and are prima facie lawful, from the date of the order until changed or modified by the Commission, or pursuant to NRS 703.373 to 703.376, inclusive.
 

 2. All regulations, practices and service prescribed by the Commission must be enforced and are prima facie reasonable unless suspended or found otherwise in an action brought for the purpose, pursuant to the provisions of NRS 703.373 to 703.376, inclusive, or until changed or modified by the Commission itself upon satisfactory showing made, or by the public utility by filing a bond pursuant to NRS 703.374.
 

 [23]
 

 NRS 703.310(2).
 

 [24]
 

 Id.
 

 [25]
 

 NRS 704.120 provides:
 

 1. If, upon any hearing and after due investigation, the rates, tolls, charges, schedules or joint rates shall be found to be unjust, unreasonable or unjustly discriminatory, or to be preferential, or otherwise in violation of any of the provisions of this chapter, the Commission shall have the power to fix and order substituted therefor such rate or rates, tolls, charges or schedules as shall be just and reasonable.
 

 2. If it shall in like manner be found that any regulation, measurement, practice, act or service complained of is unjust, unreasonable, insufficient, preferential, unjustly discriminatory or otherwise in violation of the provisions of this chapter, or if it be found that the service is inadequate, or that any reasonable service cannot be obtained, the Commission shall have the power to substitute therefor such other regulations, measurements, practices, service or acts and make such order relating thereto as may be just and reasonable.
 

 5. The Commission may at any time, upon its own motion, investigate any of the rates, tolls, charges, rules, regulations, practices and service, and, after a full hearing as above provided, by order, make such changes as may be just and reasonable, the same as if a formal complaint had been made.
 

 [26]
 

 NRS 703.373(1) provides: “Any party of record to a proceeding before the Commission is entitled to judicial review of the final decision.”
 

 [27]
 

 NRS 703.373(4) states: “The review must be conducted by the court without a jury and be confined to the record.”
 

 [28]
 

 NRS 703.373(6) provides that the court may set aside the PUC’s decision if the appellant’s substantial rights have been prejudiced because the decision: (a) violates constitutional or statutory provisions, (b) exceeds the PUC’s statutory authority, (c) was made upon unlawful procedure, (d) was affected “by other error of law,” (e) is clearly erroneous “in view of the reliable, probative and substantial evidence on the whole record,” or (f) was arbitrary or capricious “or characterized by abuse of discretion.”
 

 [29]
 

 43 Nev. 298, 312, 185 P. 801, 805 (1919).
 

 [30]
 

 Id.
 

 [31]
 

 NRS 703.310-,376;
 
 see also
 
 NRS 704.130 (providing that rates fixed by the PUC are prima facie lawful and regulations prescribed by the PUC are prima facie reasonable until changed or modified by the PUC or on judicial review);
 
 Garson,
 
 43 Nev. at 313, 185 P. at 805-06 (explaining that a court may review reasonableness of rate set by Public Service Commission but lacks any authority to set utility rates itself).
 

 [32]
 

 See
 
 State, Dep’t of Taxation
 
 v.
 
 Scotsman Mfg.,
 
 109 Nev. 252, 849 P.2d 317, 319 (1993) (stating that failure to exhaust administrative remedies “deprives the district court of subject matter jurisdiction”).
 

 [33]
 

 Campbell
 
 v.
 
 Mountain States Tel. & Tel. Co.,
 
 586 P.2d 987, 990 (Ariz. Ct. App. 1978) (quoting 3 K. Davis,
 
 Administrative Law Treatise
 
 § 20.01 at 57 (1958)),
 
 quoted in Qwest Corp. v. Kelly,
 
 59 P.3d 789, 795 (Ariz. Ct. App. 2002).
 

 [34]
 

 NRS 41.600(2)(d).
 

 [35]
 

 Nev. Const, art. 6, § 6(1).
 

 [36]
 

 See, e.g., Gayheart v. Dayton Power & Light Co.,
 
 648 N.E.2d 72, 76 (Ohio Ct. App. 1994);
 
 see also
 
 73B C.J.S.
 
 Public Utilities
 
 § 244, at 495.
 

 [37]
 

 State ex rel. v. Court of Common Pleas,
 
 776 N.E.2d 92, 97 (Ohio 2002).
 

 [38]
 

 Rule 2(J), approved by the PUC, provides: “Where a transformer bank having a capacity of 750 Kva or more is installed exclusively to serve one Customer, the Utility may meter such service at primary service voltage.’ ’
 

 [39]
 

 Nevada Power’s reliance on
 
 Southwest Gas v. Public Seiyice Commission,
 
 86 Nev. 664, 474, P.2d 379 (1970), as support for the argument that the claims in this case are within the PUC’s exclusive jurisdiction, is misplaced.
 
 Southwest Gas
 
 was decided in the context of judicial review of a Public Service Commission order, and we did not address the commission’s jurisdiction over the customer complaints at issue. Rather, the opinion addresses the commission’s jurisdiction only in the context of the relief that it awarded against the public utility.
 
 Id.
 
 at 664, 667-69, 474 P.2d at 381, 382-83.
 

 [40]
 

 Neither Nevada Power nor the PUC has cited a statute that expressly permits the PUC to grant refunds. Our research revealed one statute, NRS 703.375, related to refunds, but it addresses refunds where a court determines on judicial review that a public utility has collected excessive rates. However, our decision in
 
 Southwest Gas
 
 suggests that although the PUC may not engage in retroactive rate making, it may order refunds as a sanction where a public utility has foiled to comply with rules and regulations that affected customers’ bills. 86 Nev. 662, 474 P.2d 379.
 

 [41]
 

 See
 
 NRS 703.380 (authorizing the PUC to file a complaint in district court against a public utility seeking civil penalties not to exceed $1,000 per day when a public utility violates an applicable provision of NRS Chapter 703, 704, 704B, 705 or 708, violates a rule or regulation of the PUC, or fails, neglects, or refuses to comply with a PUC order or a district court order requiring compliance with a PUC order).
 

 [42]
 

 Cf. Ambassador Ins. Corp.
 
 v.
 
 Feldman,
 
 95 Nev. 538, 539, 598 P.2d 630, 631 (1979) (concluding that because insurance commissioner was powerless to award damages caused by defamation, “the doctrine of exhaustion of administrative remedies is not applicable”).
 

 [43]
 

 We also reject Nevada Power’s reliance on the filed-rate doctrine as barring Bonneville and Union Plaza from seeking the requested relief in the district court.
 

 [44]
 

 Rinaldo’s Const. v. Michigan Bell,
 
 559 N.W.2d 647, 652 (Mich. 1997) (quotation marks omitted).
 

 [45]
 

 United States v. Western Pac. R. Co.,
 
 352 U.S. 59, 63-64 (1956).
 

 [46]
 

 108 Nev. 37, 41, 823 P.2d 901, 903 (1992).
 

 [47]
 

 Id.
 
 (quoting
 
 Kapplemann
 
 v.
 
 Delta Air Lines,
 
 539 F.2d 165, 169 (1st Cir. 1976)).
 

 [48]
 

 United States v. Western Pac. R. Co.,
 
 352 U.S. 59, 64 (1956).
 

 [49]
 

 Rabon v. City of Seattle,
 
 34 P.3d 821, 824 (Wash. Ct. App. 2001).